WILLIS A. ADAMS, Petr. for Mandamus,

*vs.*

RALPH R. ULMER and INHABITANTS OF SOUTH THOMASTON.

| 91 | 47 |
| 93 | 133 |

Lincoln.   Opinion December 9, 1897.

*Way.   Mandamus.   Clerk.   Waters.   R. S., c. 18, § 23.   Spec. Laws, 1880,*
*c. 239; Act of Congress, Sept. 29, 1890.*

On appeal to the county commissioners a town way had been located by them in South Thomaston, which crossed navigable tide-waters. The Legislature of 1880 had authorized a bridge over tide-waters at that place. South Thomaston failed to build the bridge, and thereupon the county commissioners, on due proceedings, appointed the petitioner an agent to build it. The way on land was constructed principally by the voluntary act of individuals without charge. The agent caused the bridge to be built; rendered his account to the county commissioners which was duly allowed, and judgment entered against " the inhabitants of the town of South Thomaston and against the real estate situated in said town of South Thomaston, whether owned by such town or not," for the sum of four thousand three hundred and ninety-two dollars and four cents, being the cost of the bridge, and the charges and expenses of the agent. The county commissioners ordered a warrant of distress to issue for the amount. All the proceedings were in accordance with law. The respondent, clerk of the county commissioners, refused to issue a warrant of distress. Upon a petition for mandamus asking that he be compelled to do so, *held ;—*

(1.)   That the clerk, as a ministerial officer, was bound by law, to obey the order and judgment of the county commissioners—that judgment appearing to be regular, and upon a matter within the jurisdiction of that board. That he cannot justify a refusal, by showing mistake or misjudgment of the commissioners, nor raise the question of the sufficiency of the bridge, which had been accepted by the commissioners.

(2.)   That the five years in R. S., c. 18, § 23, within which the town cannot affect by any action the location of a town way by county commissioners, commenced to run on August 13, 1892, when the proceedings and judgment of the commissioners were affirmed by the Supreme Court; and that the attempted discontinuance of the way by South Thomaston on May 16, 1896, was premature and inoperative.

(3.)   That the permission of the Secretary of War to build the bridge over navigable tide-waters was not necessary. The act of Congress of September 29, 1890, which prohibits the erection of a bridge in navigable waters, without permission of the Secretary of War, excepts from its operation bridges,

the construction of which has been previously authorized by law. This bridge was authorized in 1880.

(4.) That the bridge is wholly within the town of South Thomaston.

(5.) That the petitioner is the proper party in whose favor the warrant of distress should issue.

ON REPORT.

The case appears in the opinion.

*True P. Pierce*, for petitioner.

*C. E. and A. S. Littlefield*, for defendants.

SITTING: PETERS, C. J., FOSTER, HASKELL, WISWELL, STROUT, SAVAGE, JJ.

STROUT, J. A petition for a town way in South Thomaston, had been presented to the selectmen of the town, who refused to locate, and thereupon a petition was presented to the county commissioners to locate the same way, upon the ground that the selectmen had unreasonably refused to locate. Upon this petition, the county commissioners, on the third day of December, 1890, located the town way as prayed for, and as described in the petition. An appeal was taken to the Supreme Judicial Court, and on the thirteenth day of August, 1892, the proceedings and judgment of the county commissioners were wholly affirmed by that court. All the proceedings thus far appear to be in accordance with law, and no objection is made, except that it is claimed that a part of the located way is in St. George.

The location included a bridge across navigable tide-waters. Such bridge was authorized by the Legislature of 1880, by chapter 239 of the special laws of that year. South Thomaston failed to open the way and build the bridge during the time limited therefor, and on May 21, 1896, on proper petition, the county commissioners ordered " that said town way and bridge be opened, built and made passable," and appointed Willis A. Adams, the present petitioner, agent " to open, build and make passable said town way and bridge," and ordered South Thomaston to pay into the county treasury of Knox county, the expense of the proceeding, taxed at sixty-three dollars and fifty cents. A copy of this adjudication

was duly mailed to the selectmen of South Thomaston, on July 29, 1896. Willis A. Adams, the agent, filed in the clerk's office a copy of the contract made by him for the construction of the bridge upon the way, and on the same day, the clerk of the county commissioners mailed by registered letter to the assessors of South Thomaston, a certificate of the filing of the contract for building the bridge, the time for its completion, October 6, 1896, and the amount to be paid therefor, to-wit, four thousand two hundred dollars, which certificate was received by one of the assessors of South Thomaston on the same day.

The contract for the bridge, dated July 8, 1896, was made with the Wrought Iron Bridge Company, of Canton, Ohio, and by its terms was to be completed in "ninety days from the date of this agreement." The bridge was built, and on the twenty-seventh day of October, 1896, it was approved and accepted by the county commissioners. On the same day the account of the agent Adams was presented to the county commissioners, and notice duly given to South Thomaston. On February 15, 1897, at a session of the county commissioners, judgment was entered against South Thomaston in favor of Willis A. Adams, agent, for the sum of "four thousand two hundred dollars, the amount due the Wrought Iron Bridge Company, contractor with the said agent for the building of the said bridge upon the said town way, and the bill of the said Willis A. Adams for superintendence, as allowed by the county commissioners, for the sum of one hundred and ninety-two dollars and four cents, . . . . and that after the clerk shall have entered up such judgment, he shall transmit a certificate of the rendition thereof to the assessors of the said town of South Thomaston," and after twenty days thereafter, if the amount remained unpaid, he shall "issue a warrant of distress upon the judgment . . . . according to the provisions of the statute in reference thereto." The record concludes, "that Willis A. Adams [duly appointed agent] recover against the inhabitants of the town of South Thomaston, and against the. real estate situated in said town of South Thomaston, whether owned by such town or not, the sum of four thousand three hundred and ninety-two dollars and four cents." A copy of

this judgment was served upon one of the assessors of South Thomaston on the same day, by the sheriff.

The respondent, who is clerk of the courts for Knox county, and ex-officio clerk of the county commissioners, refused to issue a warrant of distress, in accordance with the judgment and direction of the commissioners, and the petitioner seeks by this process to compel him to do so.

In issuing a warrant of distress, under the judgment and order of the county commissioners, the clerk acts ministerially. It is his duty to execute the direction of the commissioners, if they had jurisdiction of the subject matter, and their proceedings are regular in form. It is his duty to extend the formal record of their doings. Errors of the commissioners, anterior to their formal judgment and record, can be corrected under proper process instituted for that purpose. Their clerk cannot do so by refusing to execute the judgment. In this case, the commissioners had undoubted jurisdiction. Their judgment and record were regular in form. Their clerk cannot justify his refusal to obey their order by showing mistake or misjudgment of the commissioners. If, in auditing the charges of the agent, the commissioners have allowed illegal fees, as claimed by respondent, advantage of that cannot be taken in defense to this petition. Nor can the clerk, in this proceeding, raise the question of the sufficiency of the bridge, which had been accepted by the commissioners.

It is claimed in defense, that prior to the appointment of the agent, the town had discontinued the way. The location by the commissioners was on December 3, 1890; the attempted discontinuance by the town, on May 16, 1896. Revised Statutes, c. 18, § 23, provides that "when a town way has been laid out, graded or altered by the commissioners, their proceedings cannot be affected by any action of the town within five years." Whether this way was legally discontinued or not, depends upon the question whether the five years began to run from the original location, December 3, 1890, or from the time when the proceedings and judgment of the commissioners were affirmed by the Supreme Court, August 13, 1892. If the former is the true date, the way

had been discontinued before the appointment of the agent, and his appointment was invalid. If the latter date is the true one, the town was premature in its vote to discontinue, and it being within five years prescribed by the statute, was inoperative. It is earnestly contended that the five years began to run from December 3, 1890.

The appeal vacated the location by the commissioners, and arrested all further proceedings thereunder, until the final adjudication by the Supreme Judicial Court. R. S., c. 18, § 48; *Coombs* v. *Co. Com.,* 71 Maine, 240 ; *Winslow* v. *Co. Com.,* 31 Maine, 446. Until then the land cannot be entered upon, nor any right to damages accrue to its owner. R. S., c. 18, §§ 7, 20. Section eight of the same chapter provides for an appeal from the assessment of damages " at any time before the third day of the regular term succeeding that at which the commissioners' return is made " to the term of the Supreme Judicial Court first held in the county more than thirty days after expiration of the time for appeal. But this court held in *B. & M. R. R.* v. *County Commissioners,* 78 Maine, 170, that this provision applied only when there was no appeal from the location. If there was an appeal, then the claimant for increased damages could file his notice of appeal within sixty days after final decision in favor of the way, and file his complaint at a term of this court held more than thirty days after that. After this decision, the Legislature of 1887, ch. 181, changed the statute to conform to it.

Upon a decision by the appellate court, approving the location of the way, the commissioners are required to carry it into effect as if made by themselves. R. S., c. 18, § 50. By § 4 of the same chapter, the commissioners were required in their report of a location, to state when the way was to be opened, but that time must necessarily date from the final establishment of a located way. Prior to 1862, the location of a town way by county commissioners was final. In that year an appeal was given. Chapter 123. The then existing statute prohibiting towns from any action affecting " the proceedings " of the commissioners, within five years, was carried into the revision of 1871, without alteration ; but in 1875,

c. 25, the section was amended, by adding the word "graded" after the words "laid out", and as thus amended it stands in the revision of 1883. After the determination of the appeal, the commissioners have further "proceedings" to carry into effect the judgment. These proceedings were arrested by the appeal, but are not concluded till the appellate court has rendered its decision. The statute forbids the town doing any act affecting "the proceedings" of the commissioners.

Construing all these provisions in the light of the apparent intention of the Legislature, it is evident that § 23, limiting the power of the town, refers to the proceedings which terminate in a final location and legal establishment of the way. As this did not occur till August 13, 1892, the action of the town, within five years thereafter, was invalid, and did not discontinue the way. *Coombs* v. *Co. Com.*, supra.

It is objected that the bridge being over navigable tide-waters, and possibly an obstruction to navigation, its existence was illegal, unless permission was had from the Secretary of War. No such permission was had.

By c. 239, of special laws of Maine of 1880, authority was given for the location and establishment of a bridge, at this particular place, over tide-waters. This court has repeatedly held that the Legislature might authorize the construction of a bridge over navigable tide-waters, although navigation might thereby be impaired. *Rogers* v. *K. & P. R. R.*, 35 Maine, 323; *State* v. *Freeport*, 43 Maine, 198; *State* v. *P. & K. R. R.*, 57 Maine, 402; *State* v. *Leighton*, 83 Maine, 419. So held in *Massachusetts Commonwealth* v. *Proprietors of New Bedford Bridge*, 2 Gray, 347. Under like authority from the State, wharves and docks are built and maintained. It is undoubtedly true, that a large majority of the bridges over navigable tide-waters, and wharves and landings in them, in this state, have been erected and are maintained, without any express authority from the United States.

By the modern law of nations, the territorial jurisdiction of a state extends seaward to the distance of a marine league. See authorities cited in note to Gould on Waters, p. 9. In England

this jurisdiction was vested in the Crown. At the time of the revolution, when the people became sovereign, the respective states succeeded to the title of the Crown in the tide-waters within their territorial limit. The powers thus acquired by the states were those which in England, and in this country previous to the revolution, could have been exercised by the King. *Martin* v. *Waddell,* 16 Peters, 367. This sovereignty of the state over tide-waters for a marine league from the shore, still resides in the state. It was never surrendered to the United States, but was restricted by the Constitution of the United States, only so far as the admiralty jurisdiction of the United States Courts, and the power to regulate commerce with foreign nations and among the states, was conferred upon the general government. Neither of these is absolutely exclusive of state authority. The commerce clause of the Constitution is the only one that can affect the question here involved, and that does not render nugatory state legislation which affects commerce, but does not interfere with then existing regulations of Congress upon the same subject. *Wilson* v. *Blackbird Creek Marsh Co.,* 2 Peters, 245. It is true, that under the power to regulate commerce, given it by the constitution, Congress has the right, by appropriate laws, to so regulate the construction of bridges that navigation shall not be unnecessarily obstructed; but as stated by the Court in *Hamilton* v. *Vicksburg R. R. Co.,* 119 U. S., 281, "until Congress intervenes in such cases, and exercises its authority, the power of the state is plenary. When the state provides for the form and character of the structure, its directions will control except as against the action of Congress, whether the bridge be with or without draws, irrespective of its effect upon navigation."

In *Gilman* v. *Philadelphia,* 3 Wall. 725, the court say, "the national government possesses no powers but such as have been delegated to it. The states have all but such as they have surrendered. The power to authorize the building of bridges is not to be found in the Federal Constitution. It has not been taken from the state. It must reside somewhere. They had it before the constitution was adopted, and they have it still." "It must

not be forgotten that bridges which are connecting parts of turn-pikes, streets and railroads, are means of commercial transportation, as well as navigable waters, and that the commerce which passes over a bridge may be much greater than would ever be transported on the water it obstructs.   It is for the municipal power to weigh the considerations which belong to the subject, and to decide which shall be preferred, and how far either shall be made subservient to the other.   The states have always exercised this power, and from the nature and objects of the two systems of government they must always continue to exercise it, subject however in all cases to the paramount authority of Congress, whenever the power of the states shall be exerted within the sphere of the commercial power which belongs to the nation."

This doctrine has been repeatedly affirmed by that court.   *Pound* v. *Turck*, 95 U. S. 462; *Cardwell* v. *American Bridge Co.*, 113 U. S. 205; *Hamilton* v. *Vicksburg R. R.*, supra; *Willamette Iron Bridge Co.* v. *Hatch*, 125 U. S. 8.

We do not find that Congress acted upon the general subject of bridges over navigable tide-waters, prior to the act of July 5, 1884. By that act, it was provided that if an existing bridge or one there-after built, proved an obstruction to free navigation " by reason of difficulty in passing the draw opening or the raft span of said bridge, by rafts, steamboats or other water craft," the Secretary of War might require the owners " to cause such aids to the passage of said draw opening or of said raft span . . . . to be constructed, placed and maintained . . . . in the form of booms, dikes or other suitable and proper structures for the guiding of said rafts, steam-boats and other water craft safely through."   It will be noticed that this act recognized the rightful existence of the bridge, and only required a construction which would interfere as little as practicable with the navigation; and that both the bridge and the navigable water were of public use,—the bridge perhaps of the greater public use.   Both were intended to be enjoyed, but the one should not unnecessarily injure the other.   The water craft could not insist upon absolute and uninterrupted navigation, requiring the removal of the bridge, but must enjoy its right, subject to the

necessary partial interruption and inconvenience which a suitable bridge would occasion. By the act of August 11, 1888, which applies particularly to navigable rivers, it was provided that if by any bridge or pier therein, the current was changed so as to produce caving of the banks, the Secretary of War might require the owners to repair the damage, or by some means to be indicated by the secretary, prevent the injury. The act does not treat the bridge as a nuisance, but treats it as lawfully existing. Following this action of Congress came the act of September 19, 1890, which prohibits the building of any wharf or bridge in any navigable waters without the permission of the Secretary of War, "in such manner as shall obstruct or impair navigation," etc.; but the act provides that this prohibition shall not apply to "any bridge, bridge draw, bridge piers and abutments, the construction of which has been heretofore duly authorized by law." The bridge in question was authorized to be built by the Legislature of Maine in 1880. At that time Congress had not acted upon the subject, and under the authorities cited, the state then had full power to authorize its construction. The act of Congress, in effect, is a consent that bridges before authorized by the state, may be built and maintained without objection from the federal government. The same act provides that if "the Secretary of War shall have good reason to believe that any railroad or other bridge now constructed, or which may be hereafter constructed over any of the navigable water ways of the United States is an unreasonable obstruction to the free navigation of such waters on account of insufficient height, width of span, or otherwise, or where there is difficulty in passing the draw opening or the draw span of such bridge by rafts, steamboats or other water craft" after notice and hearing, he may require the owners "so to alter the same as to render navigation, through or under it reasonably free, easy and unobstructed." This act is a full expression of the will of Congress. It does not authorize the Secretary of War to require the removal of a bridge, nor to take any action, unless it is "an unreasonable obstruction." It recognizes, by implication, the right of a state to authorize the maintenance of such bridge, though of necessity some obstruction to

navigation, but requires it to be so constructed as not to be an "unreasonable obstruction." The act is in line with the decision of the Supreme Court of the United States, in *Mississippi & Missouri R. R. Co.* v. *Ward*, 2 Black, 485, where it was claimed that a bridge obstructing navigation was a nuisance, but the court applied the test, was it "an unreasonable obstruction."

The act of 1890 was amended in 1892, but the amendment is not material here; though it is significant that in that amendment, Congress excepted from its operation bridges, the construction of which had been previously authorized by law. Section 10 of the act of Sept. 19, 1890, prohibiting obstruction to navigation, excepts bridges, piers, etc., erected for business purposes, "whether heretofore or hereafter erected."

The consent of the Secretary of War was not necessary to the lawful construction of this bridge, and it is not subject to removal under any existing act of the federal government. The only question that can be raised, in behalf of water navigation, is whether, while it may be some obstruction, it is so constructed as to be an "unreasonable obstruction." If it is, its construction must be changed; if it is not, it has the right to exist as it is.

*Whitehead* v. *Jessup*, 53 Fed. Rep., 707, cited by respondent, was the case of a private bridge over navigable water, not connected with any public way, and in which the public had no rights, and was not authorized by any legislative authority. It was rightly held to be a nuisance. This case has no application to a bridge erected under legislative authority for public use.

The case affords no evidence that the waters at this place have been, or are likely to be, used to any important extent for purposes of navigation; and from its location, and the position of the shore and adjacent islands, depth of water and width of passage, it may be fairly presumed, that no craft that cannot safely pass under the bridge, will have occasion to navigate there.

It is also objected that a part of the bridge is in St. George. The act of 1863 setting off a part of St. George to South Thomaston, so far as important to this question, gives the boundary as "along the shore around Elwell's Point and still along the shore to

the southerly line of South Thomaston and including Seal Harbor or Spruce Head Island and Burnt Island, lying on the west side of Muscle Ridge channel." Elwell's Point is admitted to be in South Thomaston, and so is Spruce Head Island. The bridge is from Elwell's Point to the island, a distance of 448 feet, including the approaches to the bridge. In including the island as a part of South Thomaston, the Legislature undoubtedly intended to include the water in the narrow passage between the island and main land. There are large industries upon the island, requiring means of transportation by a bridge, the expense of which should be borne by South Thomaston. It can hardly be supposed that the Legislature, when it annexed the island to South Thomaston, intended to leave a narrow space between it and the main land in another town, but geographically detached from it. The rule that grants by the state are to be taken most strongly against the grantee does not apply. The Legislature made no grant. It simply changed the boundaries of two towns, both created by the state. This objection was first made in the answer to this petition. In the carefully drawn written remonstrance presented by the selectmen to the county commissioners, it was not raised, or alluded to in the most distant manner. It is surprising that the selectmen, if they regarded the present contention as valid, should have omitted it in their remonstrance, because, if true, it was a perfect defense, and ousted the jurisdiction of the county commissioners. A town way must be located in one town, and cannot be in two. This objection is without merit.

It is also objected that the records of the commissioners do not show the whole way has been made passable; but the evidence is, that all that part of the way upon land had been opened and built before the bridge was completed. It is true this was done by the residents without cost to the town, and was by agreement with the commissioners. The public has obtained its entire town way, and South Thomaston cannot complain that it has been relieved of the cost of grading. So the deflections from the location in the graded road, made for convenience or saving of cost, and not complained of by the public, cannot excuse the town from liability to pay for the

bridge. The commissioners appointed an agent to build the bridge, and open the way. The agent found the way graded, and the bridge the only missing link, which he supplied. No objection is perceived to this. We have carefully examined the record of the commissioners, and although several technical objections to it are made, we regard them all as untenable. It would be unprofitable to discuss them in detail.

It is true, that before the commissioners had made their return and entered judgment against South Thomaston, they ordered a warrant of distress to issue, and it was issued; but before anything was done in execution of the warrant, the commissioners discovered that it had been prematurely issued, and recalled and revoked it, as it was their right and duty to do. Having been improvidently issued, it was invalid, and did not afford the foundation for an alias. Then they entered up a proper judgment, under their hands, in favor of the agent and against South Thomaston, and directed their clerk to extend the record in due form; and in that judgment the commissioners ordered their clerk to issue a warrant of distress according to the statute, if the judgment was not paid within twenty days after the transmission of the certificate of the rendition thereof to the assessors of South Thomaston. Thereupon the clerk made a record in due form and transmitted a copy of it to the assessors, under the seal of the court of County Commissioners, duly attested by him, which was received by the assessors on February 15, 1897. All these proceeding appear to be regular and in accordance with law.

The commissioners made return of their doings and judgment, in writing, under their hands, as required by law, and their clerk duly extended the record. The commissioners ordered a warrant of distress to issue to the petitioner, as agent, for the cost of the bridge and his expenses for superintendence and for procuring the allowance of his account.

The petitioner is the proper party in whose favor the warrant of distress should issue. He was the contractor for the bridge, and should collect from the town, and pay the builders.

The board of County Commissioners is a court, having a seal

and clerk. Their judgments are extended and recorded by their clerk. When the clerk issues a warrant of distress in accordance with the judgment and order of the commissioners, it is issued by that court, as required by statute. Their clerk is their hand; and his ministerial act in execution of their order is, in law, their act.

It results that it was the duty of the respondent, as clerk of the commissioners, to issue a warrant of distress, in accordance with the judgment and order of the county commissioners.

This case was reported to the law court by consent of parties, "to be heard upon the petition, objection and evidence documentary and otherwise", and "the law court is to decide the case upon the pleadings and such evidence as is legally admissible and to make such orders and decrees as the rights of the parties require." Under this agreement, the parties evidently contemplated that the law court should treat the pleadings as an alternative writ and return, and have thereby waived the right to an alternative writ, and authorized the court to issue the final peremptory writ.

No damages are claimed, and none are awarded.

*Peremptory writ of mandamus to*
*issue as prayed for.*